202 March 19, 2025 No. 250

***This is a nonprecedential memorandum opinion pursuant to ORAP 10.30 and may not be cited except as provided in ORAP 10.30(1).***

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ERIN ELIZABETH MOULTON,
*Defendant-Appellant.*

Malheur County Circuit Court
21CR43191; A179234

Erin K. Landis, Judge.

Submitted April 29, 2024.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Anna R. Johnson, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Patricia G. Rincon, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, Pagán, Judge, and Mooney, Senior Judge.

MOONEY, S. J.

Affirmed.

**MOONEY, S. J.**

Defendant appeals a judgment convicting her of two counts of harassment, ORS 166.065.[1] The convictions are based on a physical and verbal altercation among defendant, her tenant, B, who was renting the basement unit of defendant's house, and B's teenage son, D. In a single assignment of error, defendant challenges the trial court's ruling excluding impeachment evidence regarding D's juvenile adjudication history. Specifically, defendant sought to cross-examine D, pursuant to OEC 609-1,[2] regarding his juvenile adjudication history, and in particular, about whether D had violated the terms of a release agreement by possessing pepper spray, which he used against defendant during the altercation. We agree that the trial court erred; however, we also conclude that the error was harmless. We, therefore, affirm.

"We review for legal error a trial court's decision to preclude a party from attempting to establish facts showing a witness's bias under OEC 609-1." *State v. Nacoste*, 272 Or App 460, 466, 356 P3d 135 (2015).

Defendant and her fiancé rented the basement unit of their house to B, who resided there with her daughter and her teenage son, D. After B had lived in the unit for about a year, defendant asked her to move out. At the time of the incident, B had not done so, and one evening, while both women were outside smoking a cigarette, defendant confronted B. B attempted to record the incident on her phone, but defendant swatted the phone out of her hand and struck B. At that point, D, who was outside with his mother, pepper sprayed defendant, and defendant then struck D.

---

[1] ORS 166.065 provides, as relevant:

"(1) A person commits the crime of harassment if the person intentionally:

"(a) Harasses or annoys another person by:

"(A) Subjecting such other person to offensive physical contact[.]"

[2] OEC 609-1 provides, as relevant:

"(1) The credibility of a witness may be attacked by evidence that the witness engaged in conduct or made statements showing bias or interest. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the statement shall be shown or disclosed to the opposing party."

Defendant was charged with two counts of harassment and two counts of fourth-degree assault. In a pretrial proceeding, defendant requested to cross-examine D pursuant to OEC 609-1 regarding his juvenile adjudication history, in particular, about whether he had violated the terms of his release agreement, which prohibited him from possessing weapons, by possessing the pepper spray. Citing OEC 609-1 and *Davis v. Alaska*, 415 US 308, 94 S Ct 1105, 39 L Ed 2d 347 (1974), defendant requested that the court "take judicial notice of [the juvenile] case number to verify the existence of the release agreement" so that defendant could "explore that with D." The trial court denied that request, ruling that "the fact that he was on a release agreement and that he violated the release agreement * * * does not show bias" and that "the juvenile proceedings are not admissible for that purpose[]."

At trial, the state played the body camera footage of a police officer who had responded to the scene and who separately interviewed defendant, B, and D. B initially told the officer that she had pepper sprayed defendant. However, D admitted that, in fact, he had pepper sprayed defendant "for the fear of [his] and [his] mom's safety." When the officer again asked B about what had transpired, she admitted that her son had used the pepper spray, and she reiterated that defendant attacked her, and that D was trying to protect her.[3] During cross-examination, defendant questioned B about why she had initially lied to the police:

"Q   Why did you tell the police that you were the one that maced [defendant] when you knew it was actually [D] that did it?

"A   Because I was afraid of my 14-year-old son getting in trouble for macing an adult.

"Q   Why were you afraid of that?

"A   I wasn't sure if pepper mace was considered a weapon.

"Q   Was your son prohibited from having weapons?

---

[3] In the body camera footage, both B and D referenced D's delinquency case. However, those statements were redacted from the footage played for the jury at trial. In the footage showing the officer's interview with defendant, she refers to D as a "delinquent." That statement was not redacted from the footage played for the jury.

"A    Probation doesn't allow weapons.

"Q    Um, so you were trying to cover for your son by lying to the police?

"A    Yes."

D also testified on cross-examination that before police arrived, his mother instructed him to tell police that she had pepper sprayed defendant to keep him out of trouble. The jury acquitted defendant of both assault charges and convicted defendant of both harassment charges.

We begin by rejecting the state's contentions that defendant's claim is unreviewable or, alternatively, that it is unpreserved. The state first argues that the court denied defendant's request to take judicial notice of the juvenile records, and thus, there is no ruling as to defendant's right to cross-examine D for us to review. *See* ORAP 5.45(3) ("Each assignment of error must identify precisely the legal, procedural, factual, or other ruling that is being challenged."). We find that characterization of the trial court's ruling at odds with the record: the trial court expressly ruled that D's juvenile records did not establish bias and that they were inadmissible for that purpose.

The state also argues that defendant failed to preserve her argument because she articulated a different theory of bias below, specifically, that D was biased based on his familial relationship with his mother. In the state's view, defendant expands her theory of bias on appeal by arguing that D might have also had a motive to curry favor with the state. Having reviewed the record, we conclude that defendant narrowly preserved her argument for appeal. Below, defendant argued that she was entitled to impeach D on the basis that he had a weapon in violation of his release agreement. Defendant cited the relevant evidentiary rule, invoked her state and federal constitutional right to confront witnesses, and identified *Davis*, in which the Supreme Court held that a criminal defendant has a constitutional right to cross-examine a witness about possible bias deriving from that witness's "probationary status as a juvenile delinquent." *Davis*, 415 US at 309, 318. Defendant explained to the court that *Davis* held that she "is constitutionally

entitled to impeach a prosecution witness by showing a bias" and that "Oregon courts have long recognized that the feelings of a witness toward the parties or interest of a witness in the outcome in a case will slant the witness's testimony[.]" On this record, we conclude that defendant's argument sufficiently alerted the trial court to the issue she now raises on appeal. *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) ("[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately[.]").

Turning to the merits, under OEC 609-1, "a party is entitled to make an initial showing of bias that presents sufficient facts from which the factfinder may infer bias, and, if the court attempts to curtail that inquiry before the initial evidentiary threshold is met, the court commits legal error." *State v. Robintree*, 325 Or App 267, 276, 528 P3d 1207, *rev den*, 371 Or 309 (2023) (internal quotation marks omitted). For criminal defendants, the right to impeach a witness for bias is also protected by the right to confront witnesses as guaranteed by Article I, section 11, of the Oregon Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution. *Davis*, 415 US at 318; *Nacoste*, 272 Or App at 467-68. A witness may be biased if they have a "reason to curry favor with the prosecution *** because of the witness's own criminal conduct or custody status." *Nacoste*, 272 Or App at 468. Evidence of such bias "includes evidence that the witness is on probation, has pending charges, or is the subject of a criminal investigation." *Id.* at 469. Here, the trial court denied defendant's request to cross-examine D regarding the juvenile adjudication and his release agreement, thereby denying defendant the opportunity to make an initial showing of bias. That was error. However, we also conclude that the error was harmless.

Under Article VII (Amended), section 3, of the Oregon Constitution, we must affirm a judgment "notwithstanding any error committed during the trial" if the judgment was "such as should have been rendered in the case." *State v. Davis*, 336 Or 19, 28, 77 P3d 1111 (2003). Thus, we must affirm despite evidentiary error if there is

"little likelihood that the particular error affected the verdict[.]" *Id.* at 32. When a trial court has improperly excluded impeachment evidence, that error is harmless if "(1) despite the exclusion, the jury nonetheless had an adequate opportunity to assess [the witness's] credibility; or (2) [the witness's] credibility was not important to the outcome of the trial." *State v. Titus*, 328 Or 475, 482, 982 P2d 1133 (1999) (discussing *State v. Hubbard*, 297 Or 789, 800, 688 P2d 1311 (1984)).

Here, we conclude that the error was harmless. First, D's credibility was not central to defendant's theory of the case. In closing, defendant argued to the jury that it should acquit her of the harassment charges because defendant had acted in self-defense and because the state failed to prove that defendant subjected B to offensive physical contact. As to her self-defense theory, in closing, she emphasized that D "maced [defendant], and it wasn't until then that [defendant] *** had physical contact with [D]." D's testimony explicitly supported that factual theory: on cross, D agreed that defendant did not hit him until after he had pepper sprayed her. As to the sufficiency of the state's case, defendant argued that she had not subjected B to "offensive physical contact" because B "belligerently[] started videotaping [defendant] and that's what cause[d] all of the physical *** things that transpired." Similarly, the state's theory was that when B started to record, defendant "knocked [the phone] out of her hand," and that action "in and of itself, [was] offensive contact." Because defendant did not dispute that she had knocked the phone out of B's hand, D's credibility did not bear on whether a reasonable person would objectively regard defendant's conduct as offensive contact. *See State v. Keller*, 40 Or App 143, 145-46, 594 P2d 1250 (1979) (explaining that, in assessing whether a defendant has subjected another to offensive physical contact, "the factfinder must apply an objective standard[:] what would a reasonable person regard as offensive contact in the circumstances, not what was the victim's subjective reaction").

Second, the jury was provided an adequate opportunity to assess D's credibility. While cross-examining B, defendant elicited testimony that D was on probation and

that he may have violated conditions of his probation by possessing a weapon, *i.e.*, the pepper spray. Moreover, the body camera footage established that B had initially lied to police, and D's testimony on cross-examination confirmed that B had instructed him to do so as well. That evidence together established not only that B and D might have had a motive to lie due to D's delinquency cases, but that B had in fact lied because of D's probation status. In those circumstances, there was little likelihood that the error affected the verdict.

Affirmed.